Thank you, Your Honor. Get to bat twice. It's true. So this case presents similar issues. Again, a motion for summary judgment based on the statute of limitations alone, but with a twist. Here the court initially said, well, the disparate impact has to be proven within the limitations period. When the city endeavored, even under protest, to do so and did produce that kind of evidence, the court then said, well, you have to show that these particular loans are inherently discriminatory. So that goes back to the question you and I were talking about earlier, Your Honor, where does an FHA loan, is it inherently discriminatory? We say that's the wrong question. We say, again, that if you get an FHA loan when you qualify for a more favorable loan, and those more favorable loans are more frequently given out to non-minority borrowers, there is discrimination. And so that is the conduct that continued. That is the conduct that occurred within the limitations period. And therefore, again, the continuing violation analysis applies. This case focuses a little bit more closely on the policies or practices, correct? Well, I think less so only because the focus was on the specific nature of the loan, the characteristics of the loan itself. But still, it goes back, you still have to link all of this to a disparate impact or a racial impact on African-Americans and Latinos, right? Yes. Yes. Okay. To do that, you got to link it to a practice or to a policy, something that the bank is employing to cause this discrimination. Right. As I read your brief and looked at the underlying motions for summary judgment, there were three things that were identified, the monitor, failure to monitor. That makes no sense to me as for, you can say that's the policy, they're not monitoring. I don't know how that relates to a causal connection. You can explain that to me, but I think that's pretty hard. The incentive of the loan agents to promote these loans because the loan value is higher and therefore their commission is higher, I find that practices across the board, all FHA loans. And then the third one was. The marketing materials. Marketing materials. Yes. Right. And that's it. How does that, how do those policies cause, where's the evidence? Well, outside the context of the summary judgment in these cases, there is a burden shifting analysis. What you do is you come up with plausible policies that show that there were reasons why this could have occurred, even if it was not intended to be racially discriminatory in nature. The business then gets to respond with a legitimate business purpose for that. And then the plaintiffs respond to that with alternative means on which that business purpose could be accomplished. How does that work here? Well, it doesn't work at summary judgment. And so, therefore, that's why we think that this was the wrong inquiry at the summary judgment stage. And so, therefore, this is, again, trying to prove your entire case within the summary judgment motion on whether you've met the statute of limitations. We're supposed to only measure that the fact that there is a discriminatory conduct, which we were able to show that conduct similar to that which went into our analysis of the pre-limitations period, continued to occur, that statistically valid, with 99 percent confidence level by our expert, disparate impact occurred in that period. And that should be enough to get us to the next stage of this case. Remember, it is their motion for summary judgment, and they have the burden. We're the non-movement, and all, all... Well, but you have to come back. You have to come back with evidence. And you have to say there's a tribal issue of fact that precludes a grant of summary judgment on the statute of limitations or on the merits. And so it does make sense to me, as I was trying to call out in the prior case, that related to all of this is, you know, the FHA and your claim is all about a practice. Right. A practice. So I was trying to... Right. And so here's the policy. You know, I'd like to start with the financial incentives. I'm sorry? I'd like to start with the financial incentives policy, okay? So if the loan is bigger, and if you're giving out more loans, you get greater commissions. That's the way it works. And it's a traditional way for the banks to reward loan officers. Except that that put a premium on putting people into these FHA or VA loans, or the high-interest loans, because they would have greater financial remuneration. And so, therefore, we said that that was one of those policies that essentially encouraged, even if unintended, this disbursement. That would be true even if you had a thousand loan seekers, all of whom were Caucasian, and the same thing occurred, right? It would be, but then there would be no disparate impact. And so here's the thing. We said, and the evidence that we put in our complaint from the confidential witnesses, which was unrebutted, indicated that there was a premium put and an incentive put on the fact that, as incentive communities mentioned, stereotypes of thinking that you could get away with this more frequently with minorities and first-time home buyers. And that, indeed, this resulted in a disparate impact. There was nothing that said that this was not true, except the one thing that the Court hung on to was that there was a $167,000 greater value in conventional loans, typically, than FHA loans. But that was comparing apples and oranges. You weren't comparing the loans that were being applied for within the class of people that we were comparing. They were applying for loans for the same exact value homes. They were applying for loans that were not measured by the average across the entire loan population. It's not possible, in your theory of what happened, that these borrowers chose an FHA loan as opposed to a conventional loan? You know, it is not possible in our view. If they were to come forward with proof of that, then we would have a counterproof issue to deal with. But there was no proof of that. The fact of the matter is, what the people come in typically for is for the best value whatsoever. Now, the Court also said that there are certain benefits to FHA loans, but there was no evidence that those offsetting benefits were sufficient to counter the fact that these were more expensive, riskier loans, more likely to result in foreclosure, which, again, is part of our expert opinions report. Are you saying as a general matter that FHA loans are riskier than conventional? No, but when you qualify for a better loan and you've gotten a more expensive loan, then there is a greater likelihood of ending up in foreclosure. And that was the testimony of our expert. Okay, so that's the commission. How about the failure to monitor? How does that cause a disparate agreement? Our contention is that once you are aware that you are creating these statistical disparities, you have an obligation to do something about it. And by your failure to do something about it, even after being notified of it, you've adopted a policy of basically turning a blind eye to the disparate impact. And that, we thought, was a sufficient policy also on top of the others, when in combination, to lead to these disparities. But that, your contention is that that causes the disparities? Well, it causes continuation of the disparities when it could be set. No, no, no, you've got to establish the cause. Well, the cause, you know, our most important contention was the financial incentives. That's the cause that we said initiated all this. Okay, so how about, now the third thing that you pointed to and that was addressed in the briefs was the marketing material. Right. How does that cause the discriminatory treatment? Well, again, where you are encouraged to put a premium on these loans, which are also going to result in greater financial incentive to you, because the marketing materials tell you this is the right loan. And someone says, well, you know, you've indicated that we can get a better loan to buy our first home. And they said, well, you know, these brochures tell us that we should put you in FHA loans without evaluating fully, as you might have with a non-minority, the other options that are available to you. That is what the problem is. And that's the discriminatory conduct that leads to disparate impact. And, of course, that disparate impact is considered an inference of intentional discrimination as well. And so the idea that we've abandoned intentional discrimination as part of our claim just is wrong because we did show that there is disparate impact sufficient to create that inference that was unroboted. So if I may, I'll leave the rest of my time for rebuttal. Judge Gould, and may it please the Court, I'm Paul Hancock here on behalf of Wells Fargo. The city's defense to the summary judgment motion has been an ever-evolving issue. They changed their theory. What Mr. Peck just described to you was not what they presented to the district court. What they presented to the district court was not what they alleged in their complaint. Let me try and tie it together if I can. But the law has changed since they filed their briefs. The law hasn't changed since they filed their briefs. No, but when they were in the district court, the law changed. Well, let me tell you what they alleged in the district court. The Supreme Court came down with two very significant cases in this whole area. Yes, but let me, if I could, because it's so different from what they're telling you now. And it makes it clear that an adverse impact case can be brought under FHA. We don't dispute that an adverse impact case can be brought. But the district court did not have the advantage of the inclusive communities decision at the time he issued his summary judgment order. But the briefing didn't focus on that. Well, the brief focused on the same standard that the Supreme Court. So let me tell you what they did. So before the district court, their argument was that when they opposed summary judgment, their argument was that the FHA loan program was disadvantageous to minorities,  and that's in the record at SER 175. When they argued before the district court, the district court expressed concern about that contention. Is the FHA program categorically? Are you talking about on the motion to dismiss or on the motion for summary judgment? On the motion for summary judgment, their opposition to the motion for summary judgment. And at oral argument, the district judge asked the city's lawyer, are you saying that an FHA loan is also a predatory loan? The response of the city's lawyer was, under these circumstances, that's what we're saying. So the contention was that an FHA loan is categorically adverse to minorities, and since minorities are more likely to get an FHA loan, which no one disputes, the federal government doesn't dispute that this program has particularly benefited minority borrowers. So it's its purpose. That's its purpose. That's its very purpose. So the adversity. The purpose was to help low-income borrowers. Yes, but there's a correlation, of course, between low income and race. And what I would start to say here is this isn't even appropriate for a disparate impact analysis. The Supreme Court has said in inclusive communities that a disparate impact analysis has to show an adverse impact, not just an impact, but an impact that's adverse. So the city only can get to this by saying every loan, categorically, that every minority borrower got under the FHA program is adverse. That's just absurd. And there's no proof on it. Now, they've changed here. And it's interesting when they came before you and they filed their brief, they said at page 13 of their brief that it has never been the city's position that FHA loans were inherently predatory. Well, that was contradicted by what they told the district court. They say it was never the city's position that FHA loans were adverse to minorities. Well, that's contradicted by the beginning of their opposition to the summary judgment motion. And they say now for the first time that for many borrowers, the FHA loan serves an important purpose. So that contradicts their theory before the district court that this loan product, which dates back to the New Deal and has provided homeownership opportunities for low and moderate income borrowers throughout the country, is predatory. So we're here on summary judgment. So let's talk about what's in this record. What do these loans look like? And how could they be considered to be predatory? Or do they fit in the category that the city now says for many borrowers the FHA loan serves a valuable purpose? There were 453 in this record. I can summarize it, I think, rather succinctly. There were 453 minority borrowers that received an FHA loan to purchase a home. 414 of those borrowers made a down payment of less than 5%. The city stipulates that borrowers who make a down payment of less than 5% are not eligible for a conventional loan. So what happens with these borrowers? Should they get no loan at all? That seems to be the city's theory. That leaves, if we're looking at home purchase loans, that leaves only 39 borrowers that got an FHA loan to purchase a home and put down more than 5%. The record evidence focuses on the 18 of those borrowers, 18 of the 39 who made the largest down payments, and that record, which is undisputed, shows that 16 of those 18 did not qualify for the conventional loan because of reasons other than the down payment requirement. In the two remaining borrowers, and that is in the record at SER 165-73, the two remaining borrowers, the evidence shows, it's unrebutted, that, again, at 165-73, that the two remaining borrowers who put down more than 5% received more favorable pricing with the FHA loan than the conventional loan. That's it. That's all the home purchasers. The other category of borrowers received a refinance loan under the FHA program. The great majority of those received refinancing under the FHA streamlined refinancing program, which provides an opportunity for borrowers to finance into a new loan with more favorable terms. There's no evidence, so every borrower that got that refinance loan by federal regulation received more favorable terms. One of the terms that they can get is, for example, at least a 5% reduction in their monthly mortgage payment. And that, again, is in the record at SER 64. The standards for the streamlined refinance program, which are designed by law to provide a benefit to borrowers, not an adversity to borrowers, a benefit to borrowers, is in the record at SER 196-212. So all these loans, every loan that we've talked about, and this is the entire pool of FHA loans to minority borrowers. There's nothing adverse about this. Nothing adverse about this. The city didn't point to any borrower who received an FHA loan who should have gotten a different loan of any type. And in their brief before you now, they're saying for many borrowers, the FHA program provides a good loan. I submit to you. I take it from that, you argue, that if the facts you just described were brought to the attention of senior officials of the bank, they would have a hard time concluding that they had a policy of disparaging minority borrowers. Sure. That's what the failure to monitor, if they did monitor, which they did. The Department of Justice consent decree, by the way, that's in the record describes Wells Fargo's fair lending policy monitoring as comprehensive. And the government or the city didn't introduce a shred of evidence as to what the monitoring policy was. They allege it's inadequate, but there's no evidence even as to what the monitoring policy is. So they didn't provide any evidence on the monitoring policy. They didn't dispute any of these loans. And I've described to you every FHA loan that's in this record, all that were made during this two-year period. There's nothing harmful to the borrowers who got these loans. But even if there were an issue with a statistical disparity, which there isn't, so it's not appropriate to use disparate impact at all, and that's the sole horse they rode into this courtroom. That's it. So it ends there. But if you were to look at the policy, and Judge Paez, you talked a lot about this, I mean, the only policy that it seems to us, and, again, this is an ever-moving target here, is the policy that loan officers are paid at least in part on a commission basis. On the value of the loan. On the dollar amount of the loan. Yeah, dollar. Right, dollar amount of the loan. The higher the dollar value, the higher the commission. Right. So, first of all, that has, and they tie that to the down payment requirement, that borrowers that get an FHA loan make a lower down payment. The government thinks that's an advantage of the FHA program. The city suggests it's a disadvantage of the FHA program, somehow makes it predatory or makes it adverse. But, you know, the inclusive communities case said that policies that can be subject to challenge are only those policies that are artificial, arbitrary, and unnecessary. That's the language of the Supreme Court. This compensation policy is specifically approved by the Federal Reserve Board as a valid measure of compensating loan officers. That's in the record at RE-171 to 175. The Department of Justice consent decree, which was designed to make sure there's no discrimination in lending, specifically authorizes this method of loan officer compensation. That's in the record at SER-465. There's, as you said, Judge Hawkins, there's no reason to think that this policy would somehow cause minorities to get FHA loans and not whites to get FHA loans. But probably the real dagger to the city is this is just their contention that this caused it. There's not a shred of evidence, none, they didn't put any evidence in the record that said any borrower got an FHA loan because of this policy of loan officer compensation. And I would also note that the loan officer compensation policy has no relevance at all to all the refinance loans in this record. It's all those beneficial refinance loans where borrowers reduce their monthly payment by at least 5% because of this loan. That policy has no applicability at all because there's no down payment on a refinance loan. And the policy has no application to what the city calls high cost loans, which is offensive in itself. There's no, the government doesn't call these loans high cost. The city changed its definition of high cost when they found out they didn't have any under their original definition. There's only a handful left that the city, even the city's expert calls negligible. But the policy they say caused this, that is the loan officer compensation policy, has no applicability to this. Loan officers are, what they call the high cost loan is based on the interest rate of the loan. Does that exceed the annual prime offer rate by a certain amount? The high cost loan, higher price loans, as they're correctly called under the Home Market Disclosure Act, are based on the interest rate of the loan. How does that deviate? So the compensation policy can't cause that. Loan officers are not paid, not paid based on the interest rate of the loan. That's at SER 272. It's not disputed. The Department of Justice consent decree doesn't permit that. The Federal Reserve Board loan officer compensation policies do not permit that. There's no evidence in this record that any loan officer was paid based on the interest rate of the loan. So that's it. That's it. That's all they have. There's no evidence here of any violation of the Fair Housing Act. None. None. Disparate impact is inapplicable to a case like this, and they fail it miserably. Now, we have a little different view than you describe, Judge Pires, in your questioning about the application. Well, I'm not just asking questions. I understand. I understand. I'd like to address it. We have contended that the continuing violation theory as described by the Supreme Court in Havens and Morgan has no applicability to a case like this. And I don't the best one good. Let me ask you, what's, you know, so in Title VII, Morgan, the hostile work environment. Yes. Works there. That's where it all came about. Yes. But Morgan talked about easily identifiable discrete acts. And a loan origination, just like a failure to get a job, is an easily identifiable discrete act for which there's, under Morgan and under Havens, there's no room for the application of the continuing violation theory. I, you know, we don't think that's really an issue. Let me ask you this. What if they could identify a policy at the bank that said, okay, we only want minorities, African Americans and Latinos, to get FHA loans because they're insured. If they default, nobody's going to lose out. So anytime you get a minority, you know, when minorities apply for these loans, direct them to FHA loans. Sure. Best deal. That would be a different case. Obviously, there's no proof in the record of anything like that. What if they found a policy like that? I would say that would be a different case. E-mails or written documents of some sort, wouldn't that fall within the continuing violation theory? That policy existed back then and it exists today. Well, I think there's room to argue that, for example, if it were a private class action challenging that, the class period generally is defined as those who are subject to the policy during the limitation period. So, but let me, any application of the continuing violation doctrine requires a violation within the limitations period. No case says otherwise. And we view this as a merits decision. It's a merits decision. A single act of, you know, say a sexual comment during the limitations period may not be enough to prove a hostile work environment. That's right. This isn't a hostile work environment case. Again, I would say to you, because I don't think this is really relevant to the issue now, but the central district of California's decision in Kimbrough versus Fremont, we think provides the proper application of Morgan and Havens in the lending context, and I refer you to that. But there's, on this record, there's simply, and another way to look at this on the policy issue is Justice Kennedy focused on the fact that the, in a disparate impact case, the remedy should focus on elimination of the offending practice. And, you know, that has a lot of logic because if the practice caused the disparities, it's just not even reasonable to contend that if loan officers weren't paid on a commission basis that the racial composition of the FHA lending pool would change. Let me close by saying, I mean, we, there's been a lot talked about in this case. The city has emphasized the importance of the Fair Housing Act. And, you know, I and our client certainly agree with it. This is a landmark civil rights law. It marches in lockstep with the 64 Civil Rights Act, with its many titles in discrimination, with the Voting Rights Act of 1965, and then the Fair Housing Act of 1968. But the sanctity of those laws also means they shouldn't be abused. And the Supreme Court focused on that possible abuse in its inclusive community decision. And we submit to you that this is just a prototypical example of an abuse of the Fair Housing Act. And we think the decision of the district court should be affirmed. Thank you. Thank you, counsel. Mr. Peck, we'll hear from you on Rapallo. Thank you, Your Honor. My friend started out by saying that the city changed its theory. But if you look at even Paragraph 1 of the original complaint, the theory is the same. These are unequal terms being offered between minority and non-minority borrowers. He also talked about how the city's counsel at trial made the categorical statement about FHA. But in his quotation from that record, he started out with the words, Under these circumstances. Under these circumstances referred to the context and the viability of an FHA loan when another more favorable loan was available to that kind of category of creditworthy applicant. Again, he urges this court to look at these loans, the FHA loans, in isolation. Not, he says, you know, look at whether this particular recipient of an FHA loan was essentially tied to some compensation scheme for a particular loan officer. That's not how we examine desperate impact. We look at the statistical disparities. And that's what the court received below. Our expert disputed the fact that there were lower interest rates, which the bank claimed was true for FHA loans. He showed that there was a higher likelihood of receiving these loans and that these loans that he identified as being within the body of analysis for purposes of disparate impact were of the same kind as the pre-statute of limitation loans that he had identified for his original analysis that went into the complaints. So, therefore, all of these joined the issue. The issue was not that there was no evidence. There was significant evidence. But the court did not seem to care about that evidence because, again, it kept changing what the focus was for purposes of deciding whether or not we have ourselves within the statute of limitations. The fact of the matter is the claims that we made were consistent both during the pre-limitation period and the post-liberation period, as long as we identify a single occurrence of the same behavior than we are within the statute of limitations. Now, you know, again, my friend talks about individual loans and examining those loans, but the individual loans are not discriminatory conduct for which the city is aggrieved. The injury, in fact, that the city receives comes from a cluster of these things happening. It is the injury to the community that the court recognized in Traficante, Gladstone, and Havens that essentially allows the city to bring this kind of an action. And that injury continues when the conduct of the bank continues in that fashion. So we submit that we have challenged all the evidence that they had put forth, that the burden was on them, that there are triable issues of fact that remain, and the city ought to have its day in court. Thank you, Your Honors. Thank you, counsel. We thank again all counsel in these FHA claims for a very helpful argument on difficult issues. So the city of L.A. v. Wells Fargo case shall be submitted.
judges: Hawkins, Gould, Paez